**Affirmed as Modified and Memorandum Opinion filed October 29, 2019.**



In The

# Fourteenth Court of Appeals

## NO. 14-17-00958-CR

**CHIRON SHARROL FRANCIS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 268th District Court
Fort Bend County, Texas
Trial Court Cause No. 14-DCR-066778**

## MEMORANDUM OPINION

A jury found appellant Chiron Sharrol Francis guilty of two counts of murder. The jury assessed punishment for each conviction at confinement for seventy-five years and a fine of $5,000. The trial court ordered the sentences to run consecutively. Following the denial of appellant's motion for new trial, this timely appeal ensued. We affirm each count as to eleven of the twelve issues asserted by appellant. We overrule in part and sustain in part appellant's tenth issue as to both counts, modify

the trial court's judgment in both counts to reflect appellant's sentences are to be served concurrently, and as to both counts affirm the judgments as modified.

## BACKGROUND

Appellant was charged with intentionally and knowingly causing the death of Eric L. Heidbreder by shooting him with a deadly weapon, a firearm (count 1). Appellant also was charged with intentionally and knowingly causing the death of Douglas H. Schwartz by shooting him with a deadly weapon, a firearm (count 2).[1] Both shootings occurred on April 11, 1994, in Fort Bend County, Texas. Appellant left the country in May 1994. In August 1994, an arrest warrant was issued for appellant. Appellant was detained in Caracas, Venezuela, sometime before June 16, 2014. In July 2014, appellant was charged with both murders, and in November of 2014, an application for extradition was submitted to Venezuelan authorities. Appellant was extradited in June 2015 and indicted for both homicides. Trial began in the fall of 2017, after multiple pretrial hearings were held in 2016 and 2017.

## CLAIM OF INSUFFICIENT EVIDENCE

Because appellant's ninth issue, if sustained, would afford the greatest relief, we address it first. In his ninth issue appellant contends the evidence is insufficient to support the jury's verdict on both counts. Although appellant also challenges factual sufficiency of the evidence, we only address whether the evidence is legally sufficient. *See Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010).

---

[1]*See* Act of May 24, 1973, 63d Leg., R.S., ch. 399, § 1, sec. 19.02, 1973 Tex. Gen. Laws 883, 913, *amended by* Act of May 28, 1973, 63d Leg., R.S., ch. 426, art. 2, § 1, sec. 19.02, 1973 Tex. Gen. Laws 1122, 1123 (1973 Penal Code § 19.02) (amended 1993) (current version at Tex. Penal Code § 19.02).

*Standard of Review*

We apply a legal-sufficiency standard of review in determining whether the evidence supports each element of a criminal offense that the State is required to prove beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, (1979); *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013); *see Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011). Under this standard, we examine all the evidence adduced at trial in the light most favorable to the verdict to determine whether a jury was rationally justified in finding guilt beyond a reasonable doubt. *Temple*, 390 S.W.3d at 360; *Criff v. State*, 438 S.W.3d 134, 136–37 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). We consider all evidence in the record, whether admissible or inadmissible. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013). We also consider both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from the evidence. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We will uphold the jury's verdict unless a rational factfinder had a reasonable doubt as to any essential element. *Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009); *West v. State*, 406 S.W.3d 748, 756 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

We consider all evidence presented at trial, but we do not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Because the jury is the sole judge of the witness's credibility and the weight given their testimony, we resolve any evidentiary conflicts or inconsistencies in favor of the verdict. *See Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000).

*The Evidence*

Schwartz's body was found in the driver's seat of a red Mazda on Park Manor. Heidbreder's body was on the pavement near the passenger side of the vehicle. Each complainant had three gunshot wounds to the head from a 9-millimeter handgun.

Appellant's defensive theory at trial was that he was not present when the complainants were shot. Accordingly, we discuss the evidence as it relates to the identity of the person who intentionally and knowingly caused the deaths of the complainants by shooting them with a firearm.

An expert for the defense, Louis Akin, prepared a video reconstruction of the shootings. The substance of Akin's testimony was that the shooter stood outside the car on the passenger's side. According to Akin, most of the shots were fired with the handgun held inside the car, as the shooter leaned into the car. Akin testified that Heidbreder was probably pulled out of the car, and he expected the person who pulled Heidbreder out of the car came in contact with Heidbreder's blood.

Raul Velasquez lived nearby. After hearing gunshots, he looked out the window and saw a man wearing a black cap and brown vest exit the backseat of a little red car on the passenger side. Velasquez saw that man drag another man out of the car. Velasquez moved to another window and saw the man in the vest on the other side of the bayou getting on a bike. Other than the man on the ground, the only person Velasquez saw was the man in the vest.

Officer Jack Greenwood testified that Velasquez described the person he saw as a light-complexioned male wearing a white baseball cap turned backwards, a

4

brown vest, and dark pants. The man was about 5'7" or 5'8" tall and weighed 130 to 140 pounds.

Ralph Pawek lived on the opposite side of the bayou from Velasquez. Pawek was in front of his house, near the street, when he heard multiple gunshots. Pawek saw the shooter by the passenger's side door of a little red car. Pawek described the man's complexion as brownish and thought he was Mexican; he had a white hat on backward. The man reached into the car and fired three more shots. Pawek then saw him take a white envelope from the area of the glove box. The man started towards the bayou, walking fast. Pawek went to the backyard to avoid being seen, and after a few minutes, looked but did not see the man. Pawek did not see anyone else.

Roy Hammond was working his first day on a new postal route when he heard "bam, bam, bam." Hammond looked across the bayou and saw someone leaning over a red car as if talking to someone on the passenger's side. Hammond proceeded on his route and when he returned to that area, Hammond saw a light-skinned black or Hispanic man on a bicycle.

Veronica Wells lived on Park Manor. Her children were playing outside when she heard what she thought could be shots. Wells stepped outside and saw a man trot by. Wells checked on her children and went inside. Wells was subsequently shown a photographic lineup and identified the man she saw that day by signing the back of the photograph. The man she identified was appellant. The photographic lineup was admitted into evidence.

Two pagers were found at the scene. One pager was on the ground by the right front tire and the other pager was on Schwartz's body. On April 11, 1994, at 8:19 a.m., a call was made from Schwartz's apartment to appellant's pager. There were two numbers registered to appellant: (1) a pager number that was disconnected less

5

than a day after the shootings; and (2) a phone number assigned to appellant's home address that was disconnected approximately two hours after the shootings.

John Chulsoo Paek, a close friend and housemate of Heidbreder, gave a video statement on April 26, 1994, that was admitted into evidence. Paek also knew Schwartz. The night of April 10, 1994, Schwartz made arrangements to purchase sixty pounds of marijuana for $24,000. Schwartz had $11,000, Heidbreder had $9,000, and Paek had $4,000. Schwartz did not reveal the name of the dealer but said he drove an Impala.

The deal was planned for April 11, 1994, because Schwartz's money was in a safe-deposit box, and he could not access it until the bank opened at 9:00 a.m. on Monday morning. About 10:00 a.m. on April 11, 1994, Paek and Heidbreder flew to Hobby Airport in Houston. Schwartz drove to Houston. Heidbreder and Paek were to check into a motel near the Astrodome and the deal would occur in the room. Heidbreder and Paek were picked up at the airport by Kelly King and his girlfriend, Katherine Aires. Around 11:15 a.m., Heidbreder and Paek checked into a motel.

Schwartz arrived at the motel about 12:15 p.m. and said the plan had changed. Schwartz was going to pick up the dealer at Taco Bell. While Schwartz was gone, Paek tried to talk Heidbreder out of the deal—believing it was a setup. Paek advised Heidbreder to leave the money at the motel and sit in the back seat of the car with Schwartz's gun. Paek had seen Schwartz's gun, a 9-millimeter, and Schwartz had told Paek that he never went to Houston without it.

When Schwartz returned, Heidbreder left with his and Paek's money in several white envelopes. Paek saw Heidbreder get in the front seat and a black male, wearing a baseball hat and shorts, climb into the back seat. Paek could not guess his height or weight.

Paek waited in the hotel room. About 4:30 p.m., Katherine Aires and Kelly King returned. When they saw the news at 5:00 p.m., they went to the police and Paek and King gave a statement.

Reynaldo Butanda testified appellant was a friend that he had known since junior high school. In the spring of 1994, appellant drove a green Chevy Impala and a brown or beige Suburban. On April 11, 1994, appellant arrived at Butanda's home on a bike. Appellant was wearing a "beanie type cap" and a brown vest but Butanda did not recall if appellant was wearing shorts or pants. Appellant needed a ride so Butanda and his neighbor drove appellant to a fast-food restaurant where appellant's Suburban was parked.

Butanda next spoke to appellant over the phone. Appellant was "panicky," and told Butanda, "I did it; I did it." Butanda went to see appellant at Athena Scopelitis' apartment. Scopelitis was not present when appellant told Butanda, "I did it, I did them in." Appellant told Butanda that he took a bike to the bayou and went back to where he had left his vehicle, and someone picked him up. He said he "did it" and then got on his bike and went to Butanda's house. The shootings occurred about three to four miles from Butanda's house. Appellant showed Butanda money in a white envelope. In a field by Scopelitis' apartment, appellant walked up to a pile, poured gas on it, and lit it on fire. Butanda did not know what was in the pile. Butanda could not be certain whether this occurred on the same day appellant came to his house on the bike, or the next day.

Butanda saw reports of the murders on the news and recognized Schwartz, whom he had seen more than once at appellant's apartment. Butanda confronted appellant and asked him if Schwartz was one of the people that he "did in." Appellant replied, "Yes." Appellant told Butanda that he met Schwartz that day to sell him

7

some "weed." The last time Butanda saw appellant, appellant said he was leaving and Butanda probably would not see him again.

On cross-examination, Butanda testified the largest amount of "weed" he saw appellant with was about a pound. Butanda also admitted that he may have been in custody as a material witness when he gave his statement, and that the police mentioned that Butanda fit the description of the suspect. Butanda testified that appellant was taller than he was and more muscular; Butanda considered himself small-built. Butanda identified appellant in a picture that was taken in May of 1994, and stated that appellant's hair looked like that the last time Butanda saw him. Butanda agreed that appellant's hair, except for the bottom part, would have been inside the beanie or skull cap. Butanda agreed that he asked about a reward flier for $11,000, but denied asking if he could collect it.

Zev Isgur had known Schwartz since grade school. Isgur had transported marijuana to Austin for Schwartz. The last time Isgur did so was two Saturdays before the shootings. Isgur denied setting up a meeting between Schwartz and another supplier, Andre Jones. Isgur said Schwartz and Jones knew each other well enough to call each other directly. According to Isgur, Schwartz was "constantly" in that neighborhood, and Isgur had waited with Schwartz at the same place where Schwartz was killed.

Athena Scopelitis testified that in 1994 she had known appellant for a few years. In May 1994, she went to the Dominican Republic with appellant and returned in October of that year. According to her trial testimony, appellant did not tell Scopelitis why he wanted to leave the country. Appellant did not return to the United States with Scopelitis; she testified she had not seen appellant since leaving the Dominican Republic. Scopelitis stated that she did not recall talking to police or

giving an affidavit. Scopelitis recalled appellant and "Rey"[2] coming to her apartment but nothing more. She testified appellant did not seem upset. Scopelitis was unaware about appellant telling federal officers that he fled because he was afraid.

Scopelitis testified that after having no contact for almost twenty years, appellant's mother contacted her a few months before trial, and they spoke several times. The most recent contact was about a week before trial. Scopelitis denied that appellant's mother told her what to say and claimed to be nervous because she believed members of the complainants' families might try to retaliate. Scopelitis denied knowing anything about the shootings when they happened and claimed appellant never talked to her about it. She said appellant had an old Impala and his other vehicle was a Suburban.

An affidavit by Scopelitis from October 1994 was admitted into evidence. Scopelitis averred:

> . . . I had a friend named Chiron Francis [appellant]. I had known Chiron him [sic] for about three years. . . . I knew that Chiron was a narcotics dealer and mainly dealt marijuana. . . .At that time, he owned a brown Suburban, but he didn't drive it very much. Through Chiron, I met a friend of his named "Ray." At the time, I did not know if "Ray" was involved in Chiron's narcotics transactions. I came to know that Ray owned a couple of guns, one of which was a handgun.

> Sometime during the middle of April, 1994, . . .Chiron came over. . . . He stayed for awhile and then he left. He came back in a couple of hours. . . . and after about 20 minutes Ray came in also. . . . I began to get the feeling that something was going on between Chiron and Ray. . . . I asked Chiron to go outside with me to check the mail so I could speak with him alone. I asked him "Is there something going on" [sic] Chiron at first said that there was nothing going on, but then told me that he was involved in a murder in Houston, Tx. and that it was a white boy that got killed. I asked Chiron where they [sic] killing had happened and he told me that it was in Southwest Houston. I asked him who had

---

[2] Scopelitis claimed not to know if "Rey" was Reynaldo Butanda.

been killed and if it was anyone that we knew. He just kept saying, "Don't worry. You don't want to get involved."

Later, Chiron and Ray left. . . . While they were gone, I went over to a friend of mine's apartment. . . . I told her that I was scared and I thought that Chiron was involved in some type of murder. . . .

When they returned, Ray stayed in the living room and Chiron and I went into the bedroom. I asked him where he had been and he told me that they had been "back there burning some clothes." I asked him whose clothes. Chiron didn't answer but just looked at me. He kept stating to me, "I don't want to tell you too much. You don't want to get involved!" I assumed that the burnt clothes had something to do with the murder that Chiron told me he was involved in. Over the next couple of days, I continued to question him about the murder and all he ever told me was, "Don't worry about it; I don't want you to get involved!" About three days after he told me about the murder, Chiron told me that we needed to go away for a while. He suggested the Caribbean and I suggested that we go to the Dominican Republic. I suspected that the reason he wanted to leave the United States, but he never actually told me that it was the reason.

We got our passports and left for the Dominican Republic the first week of May, 1994. Before we left the States, I saw Chiron counting some money inside my apartment. I recall him telling me that it was about six thousand dollars. . . . I was having problems with my pregnancy and I wanted to come back to the States so I came back this past Monday night. Chiron told me that he would come back later but I don't think he will ever come back. . . .

Scopelitis stated she did not know if "Ray" was Rey Butanda but agreed that he was Latino and shorter than appellant. Scopelitis "guessed" the passport photo of appellant admitted into evidence showed his appearance in 1994 and said appellant was "bigger" at trial. Scopelitis testified George Ward bore a resemblance to appellant at the time of the shootings and Ward's photograph was admitted into evidence. George also was involved in narcotics trafficking in 1994, but was deceased at the time of trial.

10

Jack McClain, a special agent with Homeland Security Investigations, took an audio statement from appellant on June 16, 2014, while appellant was at a detention center in Caracas, Venezuela. Appellant said he read on the Internet that he was a suspect in a double-homicide that occurred in Texas in 1994. Appellant denied ever killing anyone. Appellant said he left Texas "when the boys were murdered" because he knew them. Appellant admitted that he sold small quantities of "dope." Appellant knew Schwartz, but not the other man, and had seen both complainants on the morning they were killed. According to appellant, Schwartz called him to buy one or two pounds of "weed," which appellant said he did not have because he only had nickel and dime bags. Appellant told Schwartz to call "BJ," his Mexican connection. Appellant talked to Schwartz that morning and put him in contact with "BJ." Appellant told Schwartz to pick him up at a body shop, where appellant left his vehicle. Schwartz and Heidbreder picked appellant up around 9:00 a.m. Appellant sat in the back seat of the car, a red Mazda. They smoked a "joint" and appellant was dropped off at his house around 9:15 a.m. No one else was at his house. Appellant's father came home and saw appellant, but appellant did not remember what time. According to appellant, he was not on Park Manor on April 11, 1994, but stayed home after 9:15 a.m.

According to appellant, he next saw Schwartz and Heidbreder "on the news" and found out what happened to them the following day. Appellant testified he received a call from the Mexican mob and was told to be careful or they would come for him next. Appellant said he was scared. Appellant left his father's house and went to his girlfriend's house in Sugar Land and stayed with her for a week. According to appellant, he continued to receive death threats from the Mexican mob. Rey and others told appellant "they" were coming for him, but appellant claimed not to know the reason. Appellant speculated it was because he was the only connection

11

between the Mexican mob and the complainants. Appellant said people were threatening his family, but he did not know if his family had reported it.

Appellant went to the Dominican Republic and stayed for almost two years before going to Africa. Eventually, appellant went to Venezuela.

*Analysis*

Appellant challenges the sufficiency of the evidence on the grounds the State failed to prove that it was he who intentionally or knowingly caused the deaths of Heidbreder or Schwartz. Appellant does not contest any other element of either offense.[3]

Specifically, appellant argues there was no evidence placing him at the scene, specifically that there were no fingerprints, no DNA, and no shoe prints. Appellant references testimony that the officers processing the scene did not take enough photos, failed to examine or test the complainants' clothing, and asserts there was no positive identification of blood or DNA.

Further, appellant points to Pawek's and Hammond's failure to identify him as the person they saw on April 11, 1994. Appellant also contends witnesses did not describe the suspect as having dreadlocks, even though appellant had dreadlocks at the time that would not have been concealed by a cap. In addition, the witnesses did not describe the suspect as 6'2" tall, which is appellant's height. Wells described appellant as being of medium height but when appellant stood, Wells agreed his height was not "medium." According to appellant, the photograph Wells signed was "old" and therefore did not show how he looked on April 11, 1994. Wells could not identify appellant in court as the person she saw on April 11, 1994, but could only identify the photograph as the one she signed on April 27, 1994.

---

[3] *See* 1973 Penal Code § 19.02, *supra*, note 1.

12

Appellant contests Butanda's testimony on several grounds. Butanda was in custody in October 1994 when he gave his statement to police and officers told Butanda that Butanda fit the description of the suspect. Butanda could not provide a specific date when he spoke to appellant over the phone or went to Scopelitis' apartment and Butanda did not describe appellant as having blood on himself, mud on his bike, or being agitated. Further, Butanda's testimony that appellant said he "did it" could have referred to setting up the drug deal. Also, Butanda knew about the Crime Stoppers' reward but did not call to collect the reward or inquire about the reward.

The record reflects appellant admitted to being in the Mazda with Schwartz and Heidbreder the morning of April 11, 1994. He did not claim that had the scene been processed more thoroughly, it would have shown that he was not in the car that day. Appellant claimed he was dropped off at home by 9:15 a.m.; however, Heidbreder and Paek did not leave Austin until after 9:15 a.m. and a call was made from Schwartz's apartment to appellant's pager at 8:19 a.m. From this evidence, a rational trier of fact could have found appellant's testimony was not credible. *See Wesbrook*, 29 S.W.3d at 111 (stating the jury is the sole judge of the witness's credibility and the weight given their testimony).

The record reflects when Wells was shown the lineup, she identified the man in one of the photographs as the man she saw on April 11, 1994. She signed the back of that photograph to indicate her selection. Wells identified her signature on the back of the photograph. Wells admitted that she could not identify the person she saw that day from memory.

The jury heard evidence of the physical descriptions of the suspect given by the witnesses. The jury resolved any conflicts or inconsistencies in light of other evidence. The jury heard testimony that Velasquez and Hammond saw a man on a

bike and appellant arrived at Butanda's home on a bike, which appellant left near the scene of the shootings before being picked up by Schwartz. Paek said Heidbreder took the money with him in white envelopes. Pawek saw the suspect take a white envelope from the car. Appellant showed Butanda money in a white envelope and Scopelitis said appellant had $6,000 in cash. Appellant admitted to Butanda that he killed Schwartz and Heidbreder. Scopelitis' affidavit is consistent with Butanda's testimony. After the day of the murders, appellant disconnected his pager and phone and in May 1994, appellant left the country.

It is not for this court to re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finders. *See William*, 235 S.W.3d at 750. Rather, we resolve any evidentiary conflicts or inconsistencies in favor of the verdict. *See Wesbrook*, 29 S.W.3d at 111. Considering all the evidence in a light most favorable to the verdict, we conclude a rational juror could have found appellant guilty beyond a reasonable doubt of being the person who intentionally or knowingly caused the deaths of Heidbreder and Schwartz by shooting them with a firearm. *See Jackson*, 443 U.S. at 319; *Gear*, 340 S.W.3d at 746. Appellant's ninth issue is overruled as to both counts.

## CLAIMS THAT OFFICERS MISHANDLED EVIDENCE

In his first issue, appellant contends he was denied a fair trial in violation of his constitutional rights. *See* U.S. Const. amends. VI, XIV; Tex. Const. art. I, § 19. In his second issue appellant contends the trial court erred by denying his motion to dismiss and his motion to suppress on the grounds officers violated sections 37.09[4]

---

[4] Act of May 24, 1973, 63d Leg., R.S., ch. 399, § 1, sec. 37.09, 1973 Tex. Gen. Laws 883, 948, *amended by* Act of May 17, 1991, 72d Leg. R.S., ch. 565, § 4, 1991 Tex. Gen. Laws 2003, 2004 (1991 Tex. Penal Code § 37.09) (amended 1997, 2007, 2011) (current version at Tex. Penal Code § 37.09).

and 37.10[5] of the Texas Penal Code. As grounds for both issues, appellant claims the State, acting in bad faith, tampered with, concealed, fabricated, failed to preserve, concealed, and destroyed evidence and falsified government records. We consider these claims pursuant to the statutes in effect on April 11, 1994.

Section 37.09 provided, in pertinent part:

(a) A person commits an offense if, knowing that an investigation or official proceeding is pending or in progress, he:

(1) alters, destroys, or conceals any record, document, or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding; or

(2) makes, presents or uses any record, document, or thing with knowledge of its falsity and with intent to affect the course or outcome of the investigation or official proceeding.

Section 37.10 provided, in pertinent part:

(a) A person commits an offense if he:

(1) knowingly makes a false entry in, or false alteration of, a governmental record;

(2) makes, presents, or uses any record, document, or thing with knowledge of its falsity and with intent that it be taken as a genuine governmental record; or

(3) intentionally destroys, conceals, removes, or otherwise impairs the verity, legibility, or availability of a governmental record;

(4) makes, presents, or uses a governmental record with knowledge of its falsity. . . .

---

[5] Act of May 24, 1973, 63d Leg., R.S., ch. 399, § 1, sec. 37.10, 1973 Tex. Gen. Laws 883, 948, *amended by* Act of May 29, 1989, 71st Leg., ch. 1248, § 66, 1989 Tex. Gen. Laws 4996, 5041, *amended by* Act of May 2, 1991, 72d Leg., ch. 113, § 4, 1991 Tex. Gen. Laws 686, 687, *amended by* Act of May 17, 1991, 72d Leg., ch. 565, § 5, 1991 Tex. Gen. Laws 2003, 2004 (1991 Tex. Penal Code § 37.10) (amended 1993, 1997, 1999, 2001, 2003, 2005, 2007, 2009, 2013, 2015, 2019) (current version at Tex. Penal Code § 37.10).

In his argument, appellant complaints about specific pieces of evidence. We address these claims below.

*Heidbreder's Body*

Appellant asserts that Sergeant John Clarke's affidavits establish officers tampered with physical evidence.[6] Specifically, appellant claims officers must have moved Heidbreder's body.

At the hearing on the motion to suppress, Clarke testified that he became involved in this case in 2005 as part of the FBI Task Force on fugitive investigations. He had no personal knowledge of the crime scene. In making his affidavits he relied upon the reports and documents prepared from the investigation. Clarke acknowledged those reports may contain inaccuracies.

Clarke executed two affidavits in July 2014—one in support of appellant's extradition and the other in support of appellant's arrest. Both affidavits were admitted into evidence as exhibits during the hearing on appellant's motion to suppress. The affidavit in support of extradition states the information presented "was obtained through witness interviews, the collection of evidence, and other sources." The affidavit for the arrest warrant is based upon Clarke's review of an offense report.

Both affidavits state that Heidbreder was in the front passenger's seat. Appellant points out this statement is inconsistent with the photographic evidence of the crime scene. It is also inconsistent with evidence adduced at trial. Pawek testified he saw the suspect pull the passenger out of the car, and appellant's expert, Akin, testified that he believed the shooter pulled Heidbreder from the car.

---

[6] 1991 Tex. Penal Code § 37.09, *supra*, note 4.

There is no evidence officers moved Heidbreder's body or that Clarke's affidavit is perjurious. Rather, there is an inconsistency between the report on which Clarke relied and the evidence adduced. There is no evidence that officers altered any "thing" with intent to impair its verity, or availability as evidence in the investigation. Accordingly, the record does not reflect an offense under section 37.09 was committed.

*Shell Casings*

Appellant suggests officers falsified government records.[7] Appellant complains of an entry in the Current Information Report ("CIR") which refers to seven shell casings. However, a photograph of the interior of the car shows a shell casing not referred to in the CIR—the eighth shell casing. Further, the Investigator's Report states bullet "casings" (plural) were found adjacent to the right front wheel of the car even though the photograph shows only one casing—the ninth shell casing. There is no evidence that officers falsely, rather than mistakenly, reported the number of shell casings or made the report with knowledge of its falsity. Accordingly, the record does not reflect an offense was committed.

*The LSU Cap*

Next, appellant contends officers tampered with evidence and a government record by "planting" an LSU cap in the car. Photographs taken at the crime scene show only one baseball cap—a red and blue "KC" cap. An LSU cap was collected as evidence by an officer who was deceased at the time of trial. However, the LSU cap is not shown in any of the photographs of the crime scene. Further, appellant contends the LSU cap is not shown in any of the photographs of Schwartz and was

---

[7] 1991 Tex. Penal Code § 37.10, *supra* note 5.

17

not listed among Schwartz's clothing in the autopsy report, despite being listed in the CIR, which states:

> RED AND BLUE "KC" BALLCAP WHICH WAS ATOP A PURPLE AND GOLD "LSU" BALLCAP, BOTH ATOP [Schwartz's] HEAD.

Also, appellant argues the LSU cap had two bullet holes, neither of which lined up with the single bullet hole in the KC cap. And lastly, appellant avers the LSU cap tested negative for the presence of human blood. According to appellant, this all leads to "the inescapable conclusion . . . the LSU ballcap was planted by the police."

Appellant's characterization of the test results is inaccurate. Juli Rehfuss, a criminalist with the Houston Forensic Science Center, testified during the hearing on appellant's motion to suppress that she processed stains on both caps for the presence of blood. Rehfuss performed a Hematrace Test, which would confirm whether or not the stains were human blood, and the results were negative. Rehfuss explained the results as follows, "the item responded negatively to human origin testing by Hematrace because . . . there probably either wasn't enough sample there or the proteins were too degraded to actually register on the test." Thus, the blood test results were negative, but not necessarily because the sample was not human blood. Rehfuss further testified that she sent the sample for DNA testing, and the DNA analyst's report did give a single source human male DNA profile. There is an inconsistency between the report and the evidence adduced but there is no evidence officers planted the LSU cap in the car.

The fact that the LSU cap had two bullet holes that did not align with the single bullet hole in the KC cap is evidence the CIR report is incorrect. This is supported by a photograph showing the KC cap on Scwhartz's head. There is not another cap under the KC cap, which fits snugly. Thus, the report is inaccurate but does not establish officers planted evidence with intent to impair its verity or

availability in the investigation. Accordingly, the record does not reflect an offense was committed.[8]

## The Car

Appellant complains the car was released with no evidence having been collected from it. Specifically, appellant notes that no DNA samples were taken, no fingerprints were lifted, no tests for gunshot residue were performed, no measurements were taken, and no trajectories were calculated. However, in his audio statement to McClain, appellant admitted to being in the back seat of the car on the morning of the shootings. Appellant admitted that he was in the back seat of the car before the shootings and therefore evidence from inside the car would not have exculpated him. The release of the car does not establish officers destroyed evidence with intent to impair its availability as evidence in the investigation. Accordingly, the record does not reflect an offense was committed.[9]

## Denial-of- Due-Process or Due-Course-of-Law Claim

Appellant contends the inconsistencies described above and the failure of the State to preserve evidence amount to a denial of his rights to due process and due course of law. Further, appellant contends these evidentiary issues establish violations of the 1991 Texas Penal Code section 37.09, and therefore the evidence should have been suppressed and the cases against him dismissed.[10]

The State has a duty to preserve exculpatory evidence and potentially useful evidence. *State v. Vasquez*, 230 S.W.3d 744, 749 (Tex. App.—Houston [14th Dist.]

---

[8] The State's case was not based upon the LSU cap or any forensic evidence derived therefrom.

[9] Furthermore, the State's case was not based upon any forensic evidence taken from the car.

[10] Appellant presented these arguments to the trial court in his motion to suppress and motion to dismiss. For purposes of this appeal, we assume without deciding that violations of the

2007, no pet.). There is a distinction between "material, exculpatory evidence" and "potentially useful evidence." *Id.* at 747. Potentially useful evidence is "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988).

To show a violation of due process or due course of law based on potentially useful evidence, as opposed to material, exculpatory evidence, the defendant must show the State acted in bad faith. *Vasquez*, 230 S.W.3d at 747 (citing *Illinois v. Fisher*, 540 U.S. 544, 547–48 (2004); *Youngblood*, 488 U.S. at 58 (due process)); *Mahaffey v. State*, 937 S.W.2d 51, 53 (Tex. App.—Houston [1st Dist.] 1996, no pet.) (due course of law)). Similarly, to constitute an offense under the 1991 Texas Penal Code section 37.09, it must be proven the actor had the requisite intent.

When the trial court denied appellant's motions to suppress and dismiss, the court found appellant had presented only supposition and speculation. The trial court found that the State did not act in bad faith and there is no evidence to the contrary in our record. Accordingly, the record supports the trial court's finding that the State did not act in bad faith. Viewing the evidence in the light most favorable to the trial court's ruling, we hold the record adequately supports the trial court's finding that the State did not act in bad faith. *See Jones v. State*, 437 S.W.3d 536, 540 (Tex. App.—Texarkana 2014, pet. ref'd). Accordingly, we hold the trial court did not abuse its discretion in denying appellant's motion to suppress or motion to dismiss. *See Vasquez*, 230 S.W.3d at 747–48 (affirming denial of motion to suppress blood-test results performed on an accused intoxicant's blood sample where the trial court

---

1991 Texas Penal Code sections 37.09 and 37.10 would render the evidence inadmissible.

found that the blood sample was not destroyed in bad faith); *see also Jones*, 437 S.W.3d at 54. Issues one and two are overruled as to both counts.

## CLAIMS OF PERJURY AND FRAUD ON THE COURT

As an alternative to issue one, appellant argues in his third issue that if Sergeant Clarke's affidavits are not perjurious, the State failed to produce *Brady* material.[11] But, appellant contends, if Clarke's affidavits are perjurious, then the trial court erred in failing to find fraud on the court. Further, in issue four, appellant contends that if Clarke's affidavits are perjurious, his due process rights were violated by use of those affidavits to secure his extradition from Venezuela.

We have already concluded in our discussion of appellant's first issue, *supra,* that there is no evidence Clarke's affidavits were perjurious. Appellant asserts that if the affidavits were not perjurious, the State failed to produce *Brady* material. Specifically, appellant complains the State failed to produce evidence "showing the position of the bodies in the car when the police arrived." As set forth in our discussion of appellant's first issue, *supra,* the evidence demonstrates Heidbreder's body was not in the car when the police arrived. Thus there was no evidence "showing the position of [Heidbreder's body] in the car when the police arrived." Accordingly, we overrule issues three and four as to both counts.

## CLAIMS THAT EVIDENCE WAS ERRONEOUSLY EXCLUDED

Appellant makes a single argument for his fifth, sixth and seventh issues. In his fifth issue, appellant claims the trial court's exclusion of evidence that the State collected and produced, because there was no one to sponsor it, denied him a fair trial in violation of his federal and state constitutional rights. *See* U.S. Const. amends. VI, XIV; Tex. Const. art. I, § 19. In issue six appellant contends the trial

---

[11] *Brady v. Maryland*, 373 U.S. 83 (1963).

court's exclusion of evidence denied appellant equal protection of the law because in his criminal trial he was required to have the State authenticate or sponsor the evidence that it produced, but in a civil case the production of items by one party authenticates those items for use against that party. Lastly, in issue seven appellant asserts he was denied his right to substantive due process when *Brady* material was excluded because there was no one to sponsor or authenticate that evidence.

Appellant makes two references to the record where the trial court sustained the State's objections to evidence that he was attempting to introduce. That evidence consisted of photographs of the LSU cap and the KC cap. The two photographs of the KC cap were, in fact, admitted into evidence as defense exhibits. However, the trial court sustained the State's objection to admitting the two photographs of the LSU cap as defense exhibits. The record reflects the LSU cap is not depicted in any of the photographs of the crime scene and the officer who collected the LSU cap as evidence was deceased at the time of trial.

Assuming, without deciding, the trial court erred in excluding the photographs of the LSU cap, we conclude the exclusion of the photographs does not constitute reversible error. Generally, the erroneous exclusion of evidence offered under the rules of evidence constitutes non-constitutional error and is reviewed under Texas Rule of Appellate Procedure 44.2(b).[12] *Walters v. State*, 247 S.W.3d 204, 219 (Tex. Crim. App. 2007). However, the exclusion of evidence might rise to the level of a

---

[12] Texas Rule of Appellate Procedure 44.2 provides:

(a) *Constitutional Error*. If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.

(b) *Other Errors*. Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.

constitutional violation if: (1) a state evidentiary rule categorically and arbitrarily prohibits the defendant from offering otherwise relevant, reliable evidence vital to the defense; or (2) a trial court's clearly erroneous ruling results in the exclusion of admissible evidence that forms the vital core of a defendant's theory of defense and effectively prevents the defendant from presenting that defense. *Id.; see also Vasquez v. State*, 501 S.W.3d 691, 700 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd).

The record reflects appellant's defense was that he was not present at the scene of the shooting. As discussed in addressing appellant's claim that the evidence was insufficient to support the judgments, appellant stated that he was taken home at 9:15 a.m. and stayed there the rest of the day. Appellant offers no explanation as to how these two photographs were vital to his defense and he makes no claim that their exclusion precluded him from presenting that defense. Nor could we reasonably conclude that the photographs of the LSU cap were so vital to appellant's defense that their exclusion, in light of all the evidence adduced, contributed to his conviction. *See* Tex. R. App. P. 44.2(a). Thus, even under the heightened standard of review for constitutional error, we conclude the trial court's error, if any, was harmless. Issues five, six and seven are overruled as to both counts.

### CLAIM THAT EVIDENCE WAS ADMISSIBLE AS AN ANCIENT DOCUMENT

In his eighth issue appellant claims his federal and state constitutional rights were violated when the trial court excluded an "ancient document." *See* U.S. Const. amends. VI, XIV; Tex. Const. art. I, § 19. Specifically, appellant complains the trial court erred in refusing to admit Defendant's Exhibit 109, a written statement dated May 4, 1994, that bears the signature of Islam Mujahid.

Mujahid was driving a garbage truck for the City of Houston on April 11, 1994. He was questioned by police about a red car that he saw at a dead end where

Park Manor intersects with Castlecreek while he was driving his route. During his testimony, defense counsel asked Mujahid about a written statement he gave to police. Mujahid testified that he gave an oral statement, not a written statement. Defense counsel sought to admit a written statement as Defendant's Exhibit 109. Mujahid identified the signatures on both pages of the statement as his but testified the words in the statement above his signature were not there when he signed those two pages. At the close of voir dire, the trial court sustained the State's objection to admitting the statement but gave defense counsel leave "to try to prove this up."

On direct examination, Mujahid testified he saw the red car but that he did not look into the car and did not see anyone inside. Mujahid testified he did not sign "that paper," and did not know how his signature "got there." According to Mujahid, he did not give that statement and "those are not [his] words."

Defense counsel sought to admit Defendant's Exhibit 109 as a prior inconsistent statement. The trial court sustained the State's objection.[13]

Mujahid then speculated those statements were made by the other driver on the truck. When asked if he read the documents before signing them, Mujahid testified, "There was nothing to sign. They just questioned us." Defense counsel then passed the witness, subject to recall.

Another witness testified and proceedings ended for the day. The next day, defense counsel again sought to admit Defendant's Exhibit 109 as an ancient document under Rules of Evidence 803 and 901. Tex. R. Evid. 803, 901. The trial

---

[13] Appellant does not claim on appeal the statement was admissible as a prior inconsistent statement. *See* Tex. R. Evid. 801(e)(1); *Owens v. State,* 916 S.W.2d 713, 717 (Tex. App.—Waco 1996, no pet.) (concluding witness's voluntary written statement to police did not qualify for Rule 801(e)(1) exclusion from hearsay because the inconsistent statement must have been given under oath subject to the penalty of perjury).

court sustained the State's objection after counsel for the State confirmed that the police officer who took the statement was deceased.

Rule 803(16) provides that "[a] statement in a document that is at least 20 years old and whose authenticity is established" is an exception to the rule against hearsay, regardless of whether the declarant is available as a witness. Tex. R. Evid. 803(16). Rule 901 states that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Tex. R. Evid. 901. An example of evidence that satisfies this requirement as to a document is "evidence that it (A) is in a condition that creates no suspicion about its authenticity; (B) was in a place where, if authentic, it would likely be; and (C) is at least 20 years old when offered." Tex. R. Evid. 901(8).

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018); *Roderick v. State*, 494 S.W.3d 868, 874 (Tex. App.—Houston [14th Dist.] 2016, no pet.). If the trial court's decision is within the bounds of reasonable disagreement, we will not disturb its ruling. *Gonzalez*, 544 S.W.3d at 370. The trial court's ruling will be sustained if it is correct on any theory of law applicable to the case. *Roderick*, 494 S.W.3d at 874.

To authenticate the statement, appellant relies upon Mujahid's identification of his signatures on both pages of the statement. However, Mujahid testified that the words in the statement were not his and he did not know how his signature came to be on those two pages. Thus, the trial court had grounds to find there was some suspicion about the document's authenticity and to refuse to admit it as an ancient document. *See* Tex. R. Evid. 901(8)(A). Issue eight is overruled as to both counts.

25

## CLAIM THAT SENTENCE IS ILLEGAL

In his tenth issue appellant claims the sentences imposed are illegal for three reasons. First, appellant asserts the trial court had no authority to order consecutive sentences because section 3.03 of the Texas Penal Code and article 42.08 of the Texas Code of Criminal Procedure mandate the sentences shall run concurrently.

The version of section 3.03 of the Texas Penal Code in the effect at the time of the offense states:

> When the accused is found guilty of more than one offense arising out of the same criminal episode prosecuted in a single criminal action, sentence for each offense for which he has been found guilty shall be pronounced. Such sentences shall run concurrently.[14]

The applicable version of article 42.08 of the Texas Code of Criminal Procedure provides:

> (a) When the same defendant has been convicted in two or more cases, judgment and sentence shall be pronounced in each case in the same manner as if there had been but one conviction. Except as provided by Subsections (b) and (c), of this article, in the discretion of the court, the judgment in the second and subsequent convictions may either be that the sentence imposed or suspended shall begin when the judgment and the sentence imposed or suspended in the preceding conviction has ceased to operate, or that the sentence imposed or suspended shall run concurrently with the other case or cases, and sentence and execution shall be accordingly. . . .[15]

---

[14] Act of May 24, 1973, 63d Leg., R.S., ch. 399, § 1, sec. 3.03, 1973 Tex. Gen. Laws 883, 891 (amended 1995, 1997, 2005, 2007, 2009, 2011, 2013, 2019) (current version at Tex. Penal Code § 3.03).

[15] Act of May 27, 1965, 59th Leg., R.S., ch. 722, §1, art. 42.08, [2] 1965 Tex. Gen. Laws 317, 486, *amended by* Act of Apr. 2, 1985, 69th Leg., R.S., ch. 29, § 1, 1985 Tex. Gen. Laws 404, 404, *amended by* Act of May 30, 1987, 70th Leg., R.S., ch. 513, § 1, 1987 Tex. Gen. Laws 2125, 2125, *amended by* Act of May 28, 1989, 71st Leg., R.S., ch. 785, § 4.11, 1989 Tex. Gen. Laws 3471, 3495, Act of May 8, 1993, 73d Leg., R.S. ch. 900, § 5.03, 1993 Tex. Gen. Laws 3586, 3745, 3752 (amended 2009, 2015, 2017) (current version at Tex. Code Crim. Proc. art. 42.08).

The trial court stated in open court that the two sentences of seventy-five years would be "cumulative." The written judgments do not reflect the sentences are to be cumulative and there is no motion or order in the record before this court to cumulate the sentences. However, since the oral pronouncement controls, appellant's sentences are, in fact, cumulative. *See Coffey v. State*, 979 S.W.2d 326, 328 (Tex. Crim. App. 1998) (holding the sentence pronounced in open court represents the actual sentence and should there arise any conflict between the sentence pronounced in open court and that manifested in the ensuing judgment, the sentence pronounced in open court controls). As a general rule, when the oral pronouncement of sentence and the written judgment vary, the oral pronouncement controls. *Taylor v. State*, 131 S.W.3d 497, 500 (Tex. Crim. App. 2004); *Ex parte Madding*, 70 S.W.3d 131, 135 (Tex. Crim. App. 2002). Explaining the rationale for this rule, we have stated,

> [T]he imposition of sentence is the crucial moment when all of the parties are physically present at the sentencing hearing and able to hear and respond to the imposition of sentence. Once he leaves the courtroom, the defendant begins serving the sentence imposed. Thus, "it is the pronouncement of sentence that is the appealable event, and the written sentence or order simply memorializes it and should comport therewith."

*Madding*, 70 S.W.3d at 135 (quoting *Coffey v. State,* 979 S.W.2d 326, 328 (Tex. Crim. App. 1998)).

The trial court's general authority under article 42.08 to order consecutive sentences is statutorily limited by section 3.03 whenever a single criminal action arising out of the same criminal episode occurs. *See LaPorte v. State*, 840 S.W.2d 412, 415 (Tex. Crim. App. 1992), *overruled on other grounds by Ex parte Carter*, 521 S.W.3d 344 (Tex. Crim. App. 2017). "If the facts show the proceeding is a single criminal action based on charges arising out of the same criminal episode, the trial court may not order consecutive sentences." *Id.* Accordingly, we hold that the trial

27

court erred in failing to order that appellant's sentences shall run concurrently. *Fernandez v. State*, 814 S.W.2d 417, 420 (Tex. App.—Houston [14th Dist.] 1991), aff'd, 832 S.W.2d 600 (Tex. Crim. App. 1992).

Appellant further argues that under the Constitution of Venezuela and the Extradition Treaty between the United States and Venezuela,[16] the sentence of seventy-five years for each count is illegal. According to appellant, because he was born in 1973, a seventy-five-year sentence is an illegal life sentence. Further, appellant contends any sentence greater than thirty years is illegal. Alternatively, appellant argues the United States had to present "satisfactory assurances" that a life sentence would not be imposed.

Appellant presented these arguments to the trial court. In a hearing held on May 22, 2017, the trial court ruled as follows:

> Reading the extradition document as furnished to the Court, the interpretation thereof, the only reference to 30 years is the federal attorney's request of 30 years; and that's the only reference. There has been no limitation placed upon that in the opinion of the Court.
>
> The ruling of the Court itself does not place any limitations; however, it's very clear they were cognizant of the constitution of Venezuela which said no death penalty and no life sentence.
>
> The opinion of the individual from the State Department speaks that they entered no agreements; but the constitution of Venezuela is very clear that they will not extradite upon a life or a death sentence. Therefore, there's no limitation on years; but there is a limitation on life or death; and I will so find.

The recommendation that extradition should be granted "with the condition that [the United States] provide enough guarantees to not subject [appellant] to . . . imprisonment of more than thirty (30) years" does not establish an agreement to

---

[16] Treaty of Extradition, U.S.-Venez., art. IV, Jan. 19, 1922, 43 Stat.1698, T.I.A.S. No. 765.

limit appellant's sentence to a maximum of thirty years. Appellant did not receive a life sentence for either count—he was sentenced to a term of imprisonment for seventy-five years.

Accordingly, we reject appellant's claim that in each count his sentence of seventy-five years was illegal. We therefore overrule, in part, appellant's tenth issue on both counts. We sustain, in part, appellant's tenth issue on both counts and modify the trial court's judgments to reflect the sentences imposed shall be served concurrently.

## CLAIM THAT TRIAL COURT ERRED DURING VOIR DIRE

In his eleventh issue, appellant contends the trial court erred in refusing to strike venirepersons 1–12, 16–20, 24–29, 33–55, 59–63, 65–67, 69–70, 74, 76, 78–81, 84, 87, 89–90, and 96–100 for cause. Of these venirepersons, eleven served on appellant's jury (Nos. 4, 7, 8, 11, 26, 29, 34, 36, 37, 39 and 40).

To preserve error for a trial court's erroneous denial of a challenge for cause, appellant must show that: (1) he asserted a clear and specific challenge for cause; (2) he used a peremptory challenge on the complained-of venire member; (3) his peremptory challenges were exhausted; (4) his request for additional strikes was denied; and (5) an objectionable juror sat on the jury. *Comeaux v. State*, 445 S.W.3d 745, 750 (Tex. Crim. App. 2014); *see also Landers v. State*, 110 S.W.3d 617, 624 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (holding error in the denial of a challenge for cause was not preserved for review because defense counsel failed to use an available peremptory challenge against the allegedly objectionable juror). The record reflects appellant did not request any additional strikes and therefore failed to preserve his issue for appellate review. *See* Tex. R. App. P. 33.1. We overrule issue eleven on both counts.

29

### CLAIM THAT VIDEO RECORDING SHOULD HAVE BEEN TRANSCRIBED

In his twelfth and final issue appellant complains of this court's refusal to abate this appeal and order the court reporter to transcribe the video recording of a statement by John Chulsoo Paek. To complain of a court reporter's failure to transcribe the audio portion of a videotaped statement that was played to the jury during the guilt-innocence and punishment phases of the trial, the defendant must have preserved error by objecting before the trial court. *See Williams v. State*, 937 S.W.2d 479, 486 (Tex. Crim. App. 1996). Appellant did not object and therefore waived any such complaint on appeal. *See* Tex. R. App. P. 33.1(a). Issue twelve is overruled as to both counts.

### CONCLUSION

The judgment of the trial court in each count is modified to reflect that the sentences run concurrently. As modified, the judgments are affirmed.

Based on this disposition, it is unnecessary to address the State's issue on cross-appeal that it should be able to seek a life sentence if the case is reversed and remanded for a new trial.

/s/ Margaret "Meg" Poissant
Justice

Panel consists of Chief Justice Frost and Justices Spain and Poissant.

Do Not Publish — Tex. R. App. P. 47.2(b).